Rebecca K. Smith
Public Interest Defense Center, P.C.
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| YELLOWSTONE TO UINTAS CONNECTION, NATIVE ECOSYSTEMS COUNCIL, ALLIANCE FOR THE WILD ROCKIES, | CV-24- |
| | COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |
| Plaintiffs, | |
| vs. | |
| LEANN MARTEN, Region One Regional Forester, LISA TIMCHAK, National Forest Supervisor; U.S. FOREST SERVICE; U.S. FISH & WILDLIFE SERVICE, | |
| Defendants. | |

## I.  INTRODUCTION

1.    This is a civil action for judicial review under the Administrative Procedure
Act of the U.S. Forest Service's (USFS) and U.S. Fish & Wildlife Service's
(USFWS) authorizations of the Pintler Face Project (Project) and the
elimination of 1.1 million acres of mapped lynx habitat on the Beaverhead-
Deerlodge National Forest (Forest).

2.    Plaintiffs Yellowstone to Uintas Connection, Native Ecosystems Council,
and Alliance for the Wild Rockies attest that the decisions approving the
Project and reducing mapped lynx habitat by 1.1 million acres are arbitrary
and capricious, an abuse of discretion, and/or otherwise not in accordance
with law.

3.    A recent case in this District raised the same or similar issue on the
neighboring Custer-Gallatin National Forest in Montana.  On August 23,
2023, this Court found that the elimination of mapped lynx habitat without
NEPA analysis is unlawful.  *All. for the Wild Rockies v. United States
Forest Serv*., No. CV 21-84-M-DLC, 2023 WL 5427921 (D. Mont. Aug. 23,
2023).  Last week, on February 7, 2024, the U.S. Forest Service's appeal to
the Ninth Circuit in that case was dismissed (9th Cir. Case No. 23-3059).

4.    In this case, the elimination of 1.1 million acres of mapped lynx habitat
and/or the approval of the Pintler Face Project is unlawful for the same or

1

similar reasons as those set forth in *Alliance for the Wild Rockies v. USFS.*
Accordingly, Defendants' approval of the Project and corresponding
documents or lack thereof as written violate the National Environmental
Policy Act (NEPA), 42 U.S.C. §4331 et seq., the National Forest
Management Act (NFMA), 16 U.S.C. §1600 et seq., and/or the
Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq.

5.    Plaintiffs request that the Court either vacate the decision authorizing the
Project pursuant to 5 U.S.C. § 706(2)(A) and/or remand and enjoin
implementation of the Project.

6.    Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs,
and expenses of suit, including attorney and expert witness fees pursuant to
the Equal Access to Justice Act, 28 U.S.C. §2412, and/or such other relief as
this Court deems just and proper.

7.    Plaintiffs understand that Project activities have already commenced;
however, these activities must cease in a matter of days because no logging
or road construction activities are permitted during spring bear season,
which is March 1 through July 31.

## II. JURISDICTION

8.    This action arises under the laws of the United States and involves the
United States as a Defendant. Therefore, this Court has subject matter

jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331, 1346.

9.  An actual controversy exists between Plaintiffs and Defendants. Plaintiffs' members use and enjoy the Forest for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future.

10.  The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members have been and will be adversely affected and irreparably injured if Defendants implement the Project. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NFMA, NEPA, and the APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 & 2202, 5 U.S.C. §§ 705 & 706.

11.  Plaintiffs fully participated in the available administrative review processes for the Project; thus, they have exhausted administrative remedies..

### III. VENUE

12.  Venue in this case is proper under 28 U.S.C. §1391(e) and Local Rule 3.2(b).  Region One of the U.S. Forest Service is headquartered in Missoula

County, which is within the Missoula Division of the United States District
Court for the District of Montana.

## IV. PARTIES

13. Plaintiff YELLOWSTONE TO UINTAS CONNECTION (Y2U) is a
    non-profit public interest organization dedicated to protecting the integrity
    of habitat for native fish and wildlife in the wildlife corridor that connects
    the Greater Yellowstone Ecosystem and Northern Rockies to the Uinta
    Wilderness and Southern Rockies. Members of Y2U work to restore fish
    and wildlife habitat in and around the Yellowstone to Uintas Corridor
    through the application of science, education and advocacy. Y2U's
    members' professional and recreational activities are directly affected by
    Defendants' failure to perform their lawful duty to protect and conserve
    these ecosystems by approving the challenged Project. Y2U brings this
    action on its own behalf and on behalf of its adversely affected members

14. Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt,
    non-profit public interest organization dedicated to the protection and
    preservation of the native biodiversity of the Northern Rockies Bioregion,
    its native plant, fish, and animal life, and its naturally functioning
    ecosystems. Its registered office is located in Missoula, Montana. The
    Alliance has over 2,000 individual members, many of whom are located in

Montana. Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area. Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems. Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

15.    Plaintiff NATIVE ECOSYSTEMS COUNCIL is a non-profit Montana corporation with its principal place of business in Three Forks, Montana. Native Ecosystems Council is dedicated to the conservation of natural resources on public lands in the Northern Rockies. Its members use and will continue to use the Beaverhead-Deerlodge National Forest for work and for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing. The Forest Service's unlawful actions adversely affect Native Ecosystems Council's organizational interests, as well as its members' use and enjoyment of the Beaverhead-Deerlodge National Forest, including the Project area. Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

16.    Defendant LEANNE MARTEN is the Regional Forester for USFS Region

One and is the decision-maker whose predecessor was tasked with reviewing any changes to mapped lynx habitat.

17. Defendant LISA TIMCHAK is the National Forest Supervisor for the Beaverhead Deerlodge National Forest and is the decision-maker whose predecessor denied all objections and authorized implementation of the Decision Notice and Finding of No Significant Impact for the Project.

18. Defendant UNITED STATES FOREST SERVICE (USFS) is an administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of National Forests, including the Beaverhead-Deerlodge National Forest.

19. Defendant UNITED STATES FISH & WILDLIFE SERVICE is an administrative agency within the U.S. Department of Interior, and is responsible for lawful management of species listed under the Endangered Species Act.

## V. FACTUAL ALLEGATIONS

### A. Lynx Habitat Mapping

20. In 2000, the U.S. Fish and Wildlife Service (FWS) listed the Canada lynx as a threatened species under the Endangered Species Act (ESA).

21. Following the listing, an interagency lynx biology team consisting of biologists from the Forest Service, FWS, Bureau of Land Management, and

National Park Service developed the Lynx Conservation Assessment and Strategy (LCAS).

22. The LCAS recommended measures "intended to conserve the lynx, and to reduce or eliminate adverse effects from the spectrum of management activities on federal lands."

23. These conservation measures "focuse[d] on areas where habitat could support resident populations and contribute to the long-term conservation of lynx."

24. The LCAS described the typical characteristics of lynx habitat but did not actually develop any maps of lynx habitat.

25. Instead, the LCAS instructed that specific "national forests, BLM field offices, national parks, and wildlife refuges ... should develop or refine maps of known lynx occurrence and potential lynx habitat."

26. The LCAS also created LAUs to "provide analysis units of the appropriate scale with which to begin the analysis of potential direct and indirect effects of projects or activities on individual lynx, and to monitor habitat changes."

27. LAUs encompass both lynx habitat and non-lynx habitat, but the conservation measures generally only apply to lynx habitat within an LAU.

28. Using the LCAS criteria, the Forest Service developed lynx habitat maps for several National Forests; the Beaverhead-Deerlodge National Forest map of

lynx habitat and LAUs was produced in 2001.

29.    The 2001 Beaverhead-Deerlodge National Forest lynx habitat map

designated 2,711,422 acres as mapped lynx habitat, and designated 509

individual LAUs.

30.    In 2007, the Northern Rockies Lynx Management Direction (NRLMD)

amended the forest plans of 18 national forests, including the Beaverhead-

Deerlodge National Forest, to add "management direction ... [that]

conserves and promotes recovery of Canada lynx, by reducing or

eliminating adverse effects from land management activities on National

Forest System lands, while preserving the overall multiple-use direction of

existing plans."

31.    The NRLMD includes specific goals, objectives, standards, and guidelines

that apply to "mapped lynx habitat on National Forest System land [in the

Northern Rockies region] presently occupied by Canada lynx."

32.    The NRLMD describes lynx habitat as follows: "Lynx habitat occurs in

mesic coniferous forest that experience cold, snowy winters and provide a

prey base of snowshoe hare. In the northern Rockies, lynx habitat generally

occurs between 3,500 and 8,000 feet of elevation, and primarily consists of

lodgepole pine, subalpine fir, and Engelmann spruce. It may consist of

cedar-hemlock in extreme northern Idaho, northeastern Washington and

northwestern Montana, or of Douglas-fir on moist sites at higher elevations in central Idaho. It may also consist of cool, moist Douglas-fir, grand fir, western larch and aspen when interspersed in subalpine forests. Dry forests do not provide lynx habitat."

33. The NRLMD also explains that all lynx habitat in a national forest is considered "occupied" by lynx when: (1) "[t]here are at least two verified lynx observations or records since 1999 on the national forest unless they are verified to be transient individuals;" or (2) "[t]here is evidence of lynx reproduction on [the] national forest."

34. The Beaverhead-Deerlodge National Forest was not originally designated as an "occupied" National Forest in the 2006/2007 assessment period.

35. When the Beaverhead-Deerlodge National Forest Revised Forest Plan was issued in 2009, the Forest was still considered unoccupied.

36. However, on September 15, 2020, the Western Lynx Biology Team found: "After a comprehensive review of all the recent (2017 to present) lynx observation records provided by the BDNF and National Genomics Lab, the WLBT concludes that recent lynx detections on the BDNF meet the provisions for an 'occupied' Forest as defined in the 2006 Amended Conservation Agreement."

37. Once the Forest was deemed "occupied," the Forest Plan standards in the

NRLMD became mandatory and legally enforceable as binding Forest Plan

provisions in all mapped lynx habitat in LAUs on the Beaverhead-

Deerlodge National Forest.

38.    The NRLMD includes a map of all occupied and unoccupied lynx habitat in

the "Northern Rockies Lynx Planning Area."

39.    This map was created using the previously developed forest-level lynx

habitat maps, such as those developed for the Beaverhead-Deerlodge

National Forest in 2001.

40.    However, the NRLMD discusses the expectation that "[d]uring site-specific

project analysis, maps of lynx habitat [will] be reviewed and updated based

on local information."

41.    The NRLMD also requires that changes to LAU boundaries "be based on

site-specific habitat information" and be reviewed by the Forest Service

Regional Officer.

42.    In 2020, the Forest Service remapped lynx habitat and LAUs on the

Beaverhead-Deerlodge National Forest.

43.    In 2020, Forest Service Region One officially approved and authorized

implementation of the remapping of lynx habitat and LAUs on the

Beaverhead-Deerlodge National Forest: "the 2020 lynx habitat mapping

update completed by the BDNF is consistent with mapping update processes

summarized in the Regional Forester's 2016 memo (Marten, 2016), and consistent with mapping direction provided in the 2000 LCAS (Ruediger et al., 2000). In addition, refined LAU delineations are consistent with criteria provided in the 2000 LCAS and meet Standard LAU S1 in the NRLMD."

44. The 2020 remapping eliminated approximately 1.1 million acres of mapped lynx habitat on the Forest.

45. The 2020 remapping eliminated 431 individual LAUs on the Forest.

**B.    Project and Project Area**

46. The Forest Service signed the Decision Notice & Finding of No Significant Impact authorizing the Pintler Face Project (Project) on September 9, 2021.

47. In the Decision, the Forest Service chose Alternative 2 with modifications.

48. The Project is located 10 miles northwest of Wise River, Montana, on the south face of the Anaconda-Pintler Mountains on the Wisdom Ranger District of the Beaverhead-Deerlodge National Forest.

49. The Project includes 11,224 of tree cutting and/or burning:

    a.    3,459 acres of clearcutting,

    b.    1,532 acres of precommercial logging,

    c.    849 acres of broadcast burning,

    d.    293 acres of underburning,

    e.    4,604 acres of cutting and burning, and

f.  486 acres of lop and scatter.

50. The Project also includes 11.1 miles of new temporary road construction.

51. The Project analysis also discloses that there are currently 145.0 miles of unauthorized routes in the Project area.

52. Although the Project Decision represents that the Forest Service will "decommission" unauthorized routes, the definition of the term "decommission" in the Project decision allows the agency to simply place a sign on the road.

53. Both lynx and grizzly bears "have been recently documented within or near the project area boundary" according to the Project EA.

54. Lynx are "suspected" in the Project area.

55. Grizzly bears are "known" "resident[s]" of the Project area.

56. The Forest Service anticipates that the Project will take 5-10 years to implement.

**C.  Lynx**

57. The Project is located in LAUs BH-04, BH-05, BH-06, BH-07, and BH-08, as remapped in 2020.

58. In the prior lynx habitat map (from 2001), these LAUS were numbered differently; there were more individual LAUs in the same area; and all or almost all of the prior LAUs reached down to the highway, and therefore

contained significantly more acreage.

59.   The Forest Service concedes that there are now "portions of the project area, which fall outside of mapped LAUs and do not provide habitat for lynx" and those areas "were not further considered in lynx effects analysis, except for qualitative assessment of connectivity between LAUs."

60.   The Project EA concedes: "The proposed action would result in direct effects to lynx habitat through changes in stand structure and species composition by commercial regeneration harvest, pre-commercial thinning harvest and upland shrub, riparian, grass and aspen restoration actions. There would also be potential disturbance effects to lynx (indirect effects) due to increased traffic, human activity, and equipment use during project activities (commercial harvest activities plus non-commercial aspen, riparian, shrub and grass enhancement)."

**D.   Grizzly Bears**

61.   Grizzly bears are present throughout the North and West Big Hole and Beaverhead Mountains and it is assumed based on spring bear observations that individual grizzly bear home ranges and denning sites overlap the project area.

62.   Specifically a grizzly bear track was identified in the LaMarche area of the project area on Forest Service and BLM ownership in the project area.

63.    The grizzly bear analysis area for the Project is 220,138 acres (344 sq.

miles), and is larger than the Project area:





64. The Forest Service represents that secure habitat in this analysis area is currently 103,530 acres, which is 47%.

65. The Forest Service represents that secure habitat in this analysis area post-Project will be 106,670 acres, which is 48%.

66. The agencies provides no metric by which to measure whether 47% or 48% secure habitat satisfies the best available science on the habitat needs of grizzly bears.

67. Plaintiffs are unaware of any science that supports such a low level of secure habitat: 55% secure habitat is the minimum standard for secure habitat in Forest Plans in grizzly habitat in the United States.

68. Instead of providing a scientifically-based threshold for secure habitat for grizzly bears, from which one could meaningfully assess impacts on grizzly bears, the Forest Service states that it relies on open motorized road and trail density: "The Forest manages for specific open motorized road and trail densities (OMRTD) to provide for grizzly bear security."

69. The Forest Service discloses that the "Big Hole Landscape (where the project lies) is ABOVE the desired OMRTD detailed in the Forest Plan, at 1.4 mi road/sq. mile (desired is 1.2 mi /sq. mi)."

70. However, the action area for grizzly bears for the Project is not the entire

Big Hole Landscape as shown in the maps above; the Forest Service does not disclose OMTRD for the Project action area for grizzly bears.

71.    The action area for the Project includes private lands.

72.    The action area for the Project includes federal lands other than National Forest lands.

73.    The action area for the Project includes State lands.

74.    The calculation of OMRTD does not include roads on private lands.

75.    The calculation of OMRTD does not include roads on State lands.

76.    The calculation of OMRTD does not include unauthorized roads on National Forest lands.

77.    The calculation of OMRTD does not include roads on other federal lands.

78.    The Project Biological Opinion mandates that no timber havest activity may occur in the Spring bear season, and the Project Biological Assessment further states: "Commercial Harvest or temp road building will not take place during the spring bear season (March 1 – July 15th)."

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*The Forest Service violated NEPA by failing to prepare a stand-alone NEPA analysis, either an EA or an EIS, for the 2020 remapping of lynx habitat and LAUs on the Beaverhead-Deerlodge National Forest.*

79.  All previous paragraphs are incorporated by reference.

80.  NEPA requires federal agencies to prepare a detailed EIS for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c).

81.  Major Federal actions "include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals." 40 C.F.R. § 1508.18(a) (2020).

82.  Major Federal actions typically fall into one of four categories:

  a.   (i) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

  b.   (ii) Adoption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based.

  c.   (iii) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency

17

decisions allocating agency resources to implement a specific

statutory program or executive directive. (

d.      iv) Approval of specific projects, such as construction or management

activities located in a defined geographic area. Projects include

actions approved by permit or other regulatory decision as well as

Federal and federally assisted activities. Id. § 1508.18(b).

83.    An EIS must provide a "full and fair discussion of significant environmental

impacts," and inform "decisionmakers and the public of the reasonable

alternatives which would avoid or minimize adverse impacts or enhance the

quality of the human environment." Id. § 1502.1.

84.    The 2020 remapping of lynx habitat on the Forest removed over 1.1 million

acres of mapped lynx habitat and 431 LAUs on the Forest, thereby stripping

the legal protections of the NRLMD from those acres.

85.    This was an official agency action that was reviewed and approved by the

Forest Service Region One office.

86.    The 2020 remapping of lynx habitat and removal of LAUs is a major federal

action that requires NEPA analysis.

87.    The Forest Service did not prepare an EA or EIS for the removal of over 1.1

million acres of mapped lynx habitat and 431 LAUs on the Forest.

88.    The agency's failure to prepare an EA or EIS for this action violates NEPA

and the APA.

SECOND CLAIM FOR RELIEF

*The Forest Service violated NEPA by unlawfully tiering the Project EA and DN/FONSI to the 2020 remapping of lynx habitat and removal of LAUs..*

89.    All previous paragraphs are incorporated by reference.

90.    As noted above, there is no stand-alone NEPA analysis for the agency's 2020 decision to remove over 1.1 million acres of mapped lynx habitat and 431 LAUs from the Forest.

91.    The Project EA does not supply the missing NEPA analysis for the agency's 2020 decision to remove over 1.1 million acres of mapped lynx habitat and 431 LAUs from the Forest.

92.    Furthermore, even if the Project EA had supplied the missing analysis, which it did not, the law requires a project-level EIS for tiering to a non-NEPA programmatic document.

93.    The Project EA's application of/reliance on the 2020 remap and removal of habitat and LAUs violates NEPA because it constitutes improper tiering. There must be either a programmatic EIS or a Project EIS analysis that analyzes the direct, indirect, and cumulative effects from the Forest Service's 2020 decision to remap and remove 1.1 million acres of lynx habitat and 431 LAUs.  The agency's failure to do either renders the Project

decision arbitrary, capricious, and in violation of NEPA and the APA.

94.    As noted above in the Introduction, this Court recently addressed the same

or similar issue in *AWR v. USFS* on the neighboring Custer-Gallatin

National Forest: "Because Canfield (2016)[the 2019 remapping for the

Custer-Gallatin National Forest] has not undergone NEPA review and is not

an EIS, tiering to this document would be categorically improper under

NEPA's implementing regulations; thus, *Kern* provides the relevant

framework. Under *Kern*, the Forest Service could not rely on Canfield

(2016)'s lynx habitat map without first reviewing Canfield (2016) under

NEPA—either separately or as part of the Project EIS. In other words, the

agency could still tier to Canfield (2016) if the agency were to provide the

relevant NEPA review as part of the Project EIS." *All. for the Wild Rockies*

*v. United States Forest Serv.*, 2023 WL 5427921, at *7 (D. Mont. Aug. 23,

2023).

95.    The same analysis applies here, and the Project decision must therefore be

set aside and remanded for additional analysis in an EIS.

THIRD CLAIM FOR RELIEF

*The Forest Service's failure to prepare an EIS for the Project violates NEPA.*

96.    All previous paragraphs are incorporated by reference.

97.    Agencies must prepare an EIS for federal actions that will "significantly

affect[ ] the quality of the human environment." 42 U.S.C. § 4332(2)

98.    An EIS is required when an EA raises "substantial questions" that an agency

action will have a significant environmental effect.

99.    In challenging an agency decision not to prepare an EIS, plaintiffs need not

prove that significant environmental effects will occur; they need only raise

a substantial question that they might. This presents a low standard.

100.    The Council on Environmental Quality has adopted regulations governing

the implementation of NEPA. In determining whether a federal action

requires an EIS because it significantly affects the quality of the human

environment, an agency must consider what "significantly" means. The

regulations give it two components: context and intensity. 40 C.F.R. §

1508.27. Context refers to the setting in which the proposed action takes

place; intensity means "the severity of the impact." Id.

101.    There are ten severity factors to consider. 40 C.F.R. §1508.27.

102.    The Ninth Circuit holds: "one of these factors may be sufficient to require

preparation of an EIS in appropriate circumstances." *Ocean Advocs. v. U.S.*

*Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005).

103.    ADVERSE &/OR CUMULATIVELY SIGNIFICANT IMPACT. A full EIS

is necessary for the Project because it may have a cumulatively significant

impact.  As noted above, there is no cumulative effects analysis for the

entire grizzly bear action area that addresses all the relevant factors, including but not limited to, unauthorized roads on Forest lands, roads or logging on other federal lands in the action area (such as BLM lands), and roads or logging on private or State lands in the action area.  Moreover, the Forest Service is adopting the remapping and removal of lynx habitat and LAUs in this Project EA, but it cannot lawfully take this action without an EIS because there is no NEPA analysis yet for the programmatic action.

104.    ADVERSE EFFECT TO ESA SPECIES. A full EIS is necessary for the Project because it is likely to adversely affect grizzly bears and/or lynx.

105.    For all of these reasons, Plaintiffs have raised substantial questions whether the Project may have a significant effect, and an EIS is required under NEPA. The Forest Service has failed to set forth a convincing statement of reasons that the Project will not have a significant impact.

FOURTH CLAIM FOR RELIEF

*The USFWS Project Biological Opinion fails to use the best available science, and fails to adequately address the environmental baseline, and/or direct, indirect, and cumulative effects  on grizzly bears.*

106.    All previous paragraphs are incorporated by reference.

107.    Under the ESA, if "any species which is listed or proposed to be listed may be present in the area of [the] proposed action," the action agency must

conduct a BA. 16 U.S.C. § 1536©.

108.    The BA must evaluate the potential effects that the proposed action may

        have on listed or proposed species and critical habitat. 50 C.F.R. §

        402.12(a).

109.    The action agency "may" include "[a]n analysis of the effects of the action

        on the species and habitat, including consideration of cumulative effects[.]"

        50 C.F.R. § 402.12(f)(4).

110.    In contrast, when the agency engages in formal consultation, the ESA's

        implementing regulations mandatorily impose "an affirmative duty to

        consider cumulative effects." *Conservation Congress v. U.S. Forest Serv.*,

        720 F.3d 1048, 1055 (9th Cir. 2013); 50 C.F.R. § 402.14(g)(3) (requiring

        FWS to "[e]valuate the effects of the action and cumulative effects on the

        listed species or critical habitat")

111.    Cumulative effects are defined as "those effects of future State or private

        activities, not involving Federal activities, that are reasonably certain to

        occur within the action area of the Federal action subject to consultation."

        50 C.F.R. § 402.02.

112.    Additionally, FWS must accurately analyze the "environmental baseline,"

        which includes the "past and present impacts of all Federal, State, or private

        actions and other human activities in the action area, the anticipated impacts

of all proposed Federal projects in the action area that have already

undergone formal or early section 7 consultation, and the impact of State or

private actions which are contemporaneous with the consultation in process.

The consequences to listed species or designated critical habitat from

ongoing agency activities or existing agency facilities that are not within the

agency's discretion to modify are part of the environmental baseline."

113.    Although the agencies agree that the Project is likely to adversely affect

grizzly bears, a conclusion which requires preparation formal consultation

in the form of a Biological Opinion by USFWS, USFWS's Biological

Opinion for the Project is less than five pages long, and fails to provide any

meaningful analysis of the cumulative effects on grizzly bears, or of the

environmental baseline.

114.    Moreover, the Project BiOp does not even contain a cumulative effects

section for grizzly bears.

115.    The Forest Service concedes that the action area for grizzly bears contains

other federal lands (such as BLM lands), and private lands.

116.    The action area may also include State lands.

117.    The cumulative effects of roads and/or logging activities on grizzly bears

from private and/or State lands in the action area is not analyzed in the

Project Biological Opinion.

118.    The past, present, and anticipated impact of activities on BLM lands in the action area are also not disclosed or analyzed in the environmental baseline in the Project Biological Opinion, nor are past and present activities on private and State lands.

119.    The Project Biological Opinion relies upon adherence to an arbitrary percentage of secure habitat (47% – 49%) that has no support in the best available science as being sufficient for grizzly bear survival.  USFWS fails to provide any scientific rationale for this numeric range.  Nor does the agency indicate or assess whether the effects on grizzly bears from maintaining this specific percentage of secure habitat were assessed in a prior consultation.

120.    The Project Biological Opinion also relies on adherence to the Forest Plan open road density standard.  However,  unauthorized roads are excluded from road density calculations under the Forest Plan, and therefore are not considered as part of the Forest Plan road density standard analysis.  Thus, the Project Biological Opinion fails to provide any meaningful analysis of the impact of unauthorized roads on grizzly bears.  In preparation for this Project, the Forest Service found 140 miles of unauthorized roads in the Project area. Nonetheless, the Project Biological Opinion (1) provides no analysis of the past or present impacts of these unauthorized roads. (i.e. how

road density calculation would change if these roads were included, and would indicate different past and present impacts on grizzly bears), and (2) provides no analysis on the reasonably foreseeable impact of unauthorized roads, which will almost certainly continue to proliferate. Finally, there is no indication as to how many, if any, of these 140 miles of unauthorized roads were on the landscape at the time of the 2013 Revised Forest Plan Biological Opinion; any unauthorized roads that were created after 2013 would either need to be considered as temporary roads, and would likely push the agency past the 2013 incidental take trigger of 70 miles, or would require new analysis as additional adverse effects not previously considered. In any event, the Project Biological Opinion provides no meaningful discussion of this issue of unauthorized roads, and therefore is arbitrary and capricious and fails to consider an important factor.

121.  For all these reasons, the Project Biological Opinion is arbitrary and capricious and must be set aside.

## VII. RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the following relief:

A.    Declare that the Project violates the law;

B.    Either vacate the Project decision or remand and enjoin implementation of

the Project;

C.     Award Plaintiffs their costs, expenses, expert witness fees, and reasonable

attorney fees under EAJA; and

D.     Grant Plaintiffs any such further relief as may be just, proper, and equitable.


Respectfully submitted this 16th Day of February, 2024.


*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Attorneys for Plaintiffs