Rebecca K. Smith
Public Interest Defense Center, P.C.
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| YELLOWSTONE TO UINTAS CONNECTION, NATIVE ECOSYSTEMS COUNCIL, ALLIANCE FOR THE WILD ROCKIES, | CV-24-25-DLC-KLD |
| Plaintiffs, | BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER |
| vs. | |
| LEANN MARTEN, Region One Regional Forester, LISA TIMCHAK, National Forest Supervisor; U.S. FOREST SERVICE; U.S. FISH & WILDLIFE SERVICE, | |
| Defendants. | |

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INDEX OF EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      Plaintiffs raise serious questions on the merits. . . . . . . . . . . . . . . . . . 3

                1.      As this Court recently held in *Greater Red Lodge II*, remapping
                        "lynx habitat" without a NEPA process is unlawful.  Thus,
                        Claims 1 and 2 of Plaintiffs' Complaint raise serious questions
                        regarding the remapping of lynx habitat on this Forest without
                        a NEPA process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

                        a.      The Forest Service violated NEPA by failing to prepare a
                                NEPA analysis for the 2020 remapping of lynx habitat
                                and LAUs on the Beaverhead-Deerlodge National
                                Forest, which removed 1.1 million acres of lynx habitat
                                and 431 LAUs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                        b.      The Forest Service violated NEPA by unlawfully tiering
                                the Pintler Face Project EA and DN/FONSI to the 2020
                                remapping of lynx habitat and removal of LAUs. . . . . 11

                2.      As this Court recently held in *Ripley*, *Knotty Pine*, and *Marten*,
                        a biological opinion for grizzly bears is arbitrary and capricious
                        if it does not adequately address illegal motorized use, and
                        State and private activities in the action area.  Thus, Claim 3 of
                        Plaintiffs' Complaint raises serious questions because these
                        required analyses are missing from the Biological Opinion for
                        the Project. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

B.      There is a likelihood of irreparable harm in the absence of preliminary relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.      The public interest and balance of the equities tip sharply in favor of Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

TABLE OF AUTHORITIES

**CASES**

All. for the Wild Rockies v. USFS,

   2023 WL 5427921 (D. Mont. 2023) . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 8, 12, 13

All. for the Wild Rockies v. Gassmann, 604 F. Supp. 3d 1022 (D. Mont. 2022) . 25

All. for the Wild Rockies v. Marten, 585 F. Supp. 3d (D. Mont. 2021) . . 19, 20, 25

Alliance for the Wild Rockies v. Cottrell,

   632 F.3d 1127 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 22, 23, 24

Amoco Production Company v. Village of Gambell, AK, 480 U.S. 531 (1987) . 21

Ctr. for Biological Diversity v. USFS,

   670 F. Supp. 3d (D. Mont. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 25

Colorado Wild v. USFS, 523 F.Supp.2d 1213 (D. Colo. 2007) . . . . . . . . . . . . . 24

Earth Island Inst. v. USFS, 351 F.3d 1291 (9th Cir. 2003) . . . . . . . . . . . . . . . . 23

Kern v. BLM. 284 F.3d 1062 (9th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Landwatch v. Connaughton, 905 F.Supp.2d 1192 (D. Or. 2012) . . . . . . . . 3, 23, 25

League of Wilderness Defs v. Connaughton, 752 F.3d 755 (9th Cir. 2014) . . . . . 24

Native Ecosystems Council v. Davey,

   866 F. Supp. 2d 1209 (D. Id. 2012) . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 12, 13

Native Ecosystems Council v. USFS, 866 F. Supp. 2d 1209 (D. Id. 2012) . . . . . 24

Oregon Nat. Resources Council Fund v. Forsgren,

    252 F.Supp.2d 1088 (D. Or. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 12

Republic of the Philippines v. Marcos, 862 F.2d 1355 (9th Cir. 1988) . . . . . . . 3, 4

Rockies v. Marten, 2016 WL 6901264 (D. Mont. 2016). . . . . . . . . . . . . . . . . . . . 4

Sierra Club v. Bosworth, 510 F.3d 1016 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . 23

Western Watersheds Project v. USFS, 2017 WL 5571574 (D. Id. 2017) . . . . . . . 2

Winter v. Nat. Resources Defense Council, 129 S.Ct. 365 (2008) . . . . . . . . . . 2, 23

**STATUTES**

42 U.S.C. § 4332(2)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**REGULATIONS**

40 C.F.R. § 1501.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

40 C.F.R. § 1508.18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

50 C.F.R. § 402.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

50 C.F.R. § 402.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

INDEX OF EXHIBITS

| Exhibit 1 | 2020 Remapping Decision, Beaverhead-Deerlodge National Forest |
|-----------|--------------------------------------------------------------|
| Exhibit 2 | Lynx Amendment Record of Decision |
| Exhibit 3 | 2020 "Occupied" Finding, Beaverhead-Deerlodge National Forest |
| Exhibit 4 | 2020 Remapping Decision Regional Forester Authorization |
| Exhibit 5 | Pintler Face Project Decision |
| Exhibit 6 | Pintler Face Project Environmental Assessment |
| Exhibit 7 | Pintler Face Project Wildlife Report |
| Exhibit 8 | Pintler Face Project Biological Assessment |
| Exhibit 9 | Pintler Face Project Biological Opinion |
| Exhibit 10 | Pintler Face Response to EA Comments |
| Exhibit 11 | Pintler Face Project Forest Health Report |

## I.  INTRODUCTION

Plaintiffs respectfully move this Court for a preliminary injunction and/or temporary restraining order against the Pintler Face logging project on the Beaverhead-Deerlodge National Forest.  Due to grizzly bear protections in the area, no activities may occur in the Project area from March 1, 2024 to July 15, 2024.  Therefore, no activities are currently occurring in the Project area, but activities may commence or re-commence as soon as July 16, 2024. The Forest Service has awarded four timber sales for the Project. The first sale was awarded in mid-2022; the second sale was awarded in early 2023; and the remaining two sales were awarded either in 2023 or this year.  One sale is complete; two are ongoing; and one has not yet started.  *See* Docs. 17-3 ¶10; 17-2 ¶1.  The Parties have agreed to a briefing schedule for this motion, and the motion will be fully briefed by June 17, 2024.

As set forth below, because there are serious questions on the merits, and because activities may commence or re-commence as soon as July 16, 2024, Plaintiffs respectfully request a preliminary injunction and/or temporary restraining order to maintain the status quo and prevent irreparable harm until this Court has the opportunity to issue a final decision on the merits in this case.

## II.  STANDARD OF REVIEW

In general, "[a] plaintiff seeking a preliminary injunction must establish that

1

[it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Defense Council*, 129 S.Ct. 365, 374 (2008). The Ninth Circuit applies a sliding scale test to these factors, which does not require absolute surety on the "likelihood of success on the merits" prong.  Instead, if the plaintiff can at least raise "serious questions going to the merits," and demonstrate "a balance of hardships that tips sharply towards the plaintiff" the plaintiff is entitled to preliminary injunctive relief "so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  Furthermore, "the standard for issuing a preliminary injunction is virtually identical to the standard for issuing a temporary restraining order." *W. Watersheds Project v. USFS*, 2017 WL 5571574, at *1 (D. Id. 2017).

## III.   ARGUMENT

As set forth below, a preliminary injunction is necessary and appropriate in this case.  First, the public interest and balance of equities tip sharply in Plaintiffs' favor and there is a likelihood of irreparable harm in the absence of preliminary relief.  Further, there are at least serious questions on the merits.  Accordingly, a preliminary injunction should be entered to preserve the status quo until this Court

issues a final ruling on the merits in this case.

## A.    Plaintiffs raise serious questions on the merits.

"[T]he elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.  For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits."  *Cottrell*, 632 F.3d at 1131 (citation omitted).  Thus, the Ninth Circuit "has adopted and applied a version of the sliding scale approach under which a preliminary injunction could issue where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'"  *Id*.

"Serious questions on the merits" are those that present a "fair ground for litigation and thus for more deliberative investigation."  *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).  "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'"  *Landwatch v. Connaughton*, 905 F.Supp.2d 1192, 1198 (D. Or. 2012)(citation omitted).  In other words, "a fair chance of success[] is all that is required."  *Marcos*, 862 F.2d at 1362.

As set forth below, Plaintiffs satisfy the requirements of raising questions that present "fair ground for litigation" and a "fair chance of success;" therefore,

Plaintiffs have adequately raised "serious question on the merits." *Id.*

> **1.     As this Court recently held in *Greater Red Lodge II*, remapping "lynx habitat" without a NEPA process is unlawful.  Thus, Claims 1 and 2 of Plaintiffs' Complaint raise serious questions regarding the remapping of lynx habitat on this Forest without a NEPA process.**

In 2000, the U.S. Fish and Wildlife Service (FWS) listed the Canada lynx as a threatened species under the Endangered Species Act (ESA).  *See All. for the Wild Rockies v. USFS* (hereinafter "*Greater Red Lodge II*[1]"), No. CV 21-84-M-DLC, 2023 WL 5427921, at *3 (D. Mont. 2023), *appeal dismissed*, No. 23-3059, 2024 WL 1729833 (9th Cir. 2024).  Subsequently, an interagency lynx biology team developed the Lynx Conservation Assessment and Strategy (Lynx Strategy). 2023 WL 5427921, at *3.

The Lynx Strategy describes lynx habitat but does not map lynx habitat. *Id.* Instead, it directs federal land management agencies to "develop or refine maps of known lynx occurrence and potential lynx habitat." *Id.*  The Lynx Strategy also creates Lynx Analysis Units or "LAUs" to "provide analysis units of the appropriate scale . . . ." *Id.*

---

[1] In *Greater Red Lodge I*, this Court denied Defendants' request for a stay on prudential mootness grounds, and issued a preliminary injunction.  *All. for the Wild Rockies v. Marten,* 200 F. Supp. 3d 1129 (D. Mont. 2016); *Rockies v. Marten*, No. CV-15-99-M-BMM, 2016 WL 6901264 (D. Mont. 2016). Subsequently, the Forest Service withdrew the Project, and the revised and re-approved Project was the subject of litigation in *Greater Red Lodge II.*

The Forest Service developed a lynx habitat map for the Beaverhead - Deerlodge National Forest in 2001.  Ex. 1 at 1.   The 2001 Beaverhead-Deerlodge National Forest lynx habitat map designates 2,711,422 acres as mapped lynx habitat, and designates 509 individual LAUs.  Ex. 1 at 2–3.

In 2007, the Northern Rockies Lynx Management Direction (Lynx Amendment) amended the Forest Plans of 18 National Forests, including the Beaverhead-Deerlodge National Forest.  Ex. 2 at 1. The Lynx Amendment includes enforceable habitat management standards that apply to "mapped lynx habitat on National Forest System land presently occupied by Canada lynx . . . ." Ex. 2 at 1.

The Beaverhead-Deerlodge National Forest was not originally designated as an "occupied" Forest; however, on September 15, 2020, the Western Lynx Biology Team (Biology Team) found:

> After a comprehensive review of all the recent (2017 to present) lynx observation records provided by the [Forest Service] and National Genomics Lab, the [Biology Team] concludes that recent lynx detections on the [Forest] meet the provisions for an "occupied" Forest as defined in the 2006 Amended Conservation Agreement. . . . the [Biology Team] recommends that all mapped lynx habitat on the Forest . . . should, by definition, be considered "occupied."

Ex. 3 at 80.

Once the Forest was designated as legally "occupied" by lynx, the Forest Plan standards in the Lynx Amendment became mandatory and legally enforceable

as binding Forest Plan provisions in all mapped lynx habitat in LAUs on the

Forest.  *See* Ex. 2 at 1.

In 2020, the Forest Service remapped lynx habitat and LAUs on the

Beaverhead-Deerlodge National Forest.  Ex 1 at 14.  With the 2020 remapping, the

Forest Service reduced lynx habitat acreage on the Forest from 2,711,422 acres to

1,625,806 acres, thereby eliminating 1,085,616 acres of mapped lynx habitat on

the Forest.  Ex. 1 at 14.  Additionally, with the 2020 remapping, the Forest Service

reduced LAUs on the Forest from 509 LAUs to 78 LAUs, thereby eliminating 431

LAUs on the Forest.  Ex. 1 at 14.

The Forest Service did not prepare a NEPA analysis for the elimination of

431 LAUs on the Forest.  The Forest Service did not prepare a NEPA analysis for

the elimination of approximately 1.1 million acres of lynx habitat on the Forest.

> **a.** **The Forest Service violated NEPA by failing to prepare a NEPA analysis for the 2020 remapping of lynx habitat and LAUs on the Beaverhead-Deerlodge National Forest, which removed 1.1 million acres of lynx habitat and 431 LAUs.**

NEPA requires federal agencies to prepare a detailed EIS for any "major

Federal actions significantly affecting the quality of the human environment." 42

U.S.C. § 4332(2)(c).  Major Federal actions "include new and continuing

activities, including projects and programs entirely or partly financed, assisted,

conducted, regulated, or approved by Federal agencies; new or revised agency

rules, regulations, plans, policies, or procedures; and legislative proposals." 40 C.F.R. § 1508.18(a) (2020).

"Major Federal actions" include adoption of "official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based," as well as adoption of programs "such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." 40 C.F.R. § 1508.18(b).

As discussed above, the 2020 remapping of lynx habitat on the Forest removed almost 1.1 million acres of mapped lynx habitat, as well as 431 LAUs, on the Forest, thereby stripping the legal protections of the Lynx Amendment from those acres. Ex. 1 at 14.   In other words, the 2020 remapping decision dictates where, how, and if future logging activities on the Forest must be restrained to conserve lynx.  Moving forward – on almost 1.1 million acres – logging activities no longer need to be restrained to protect lynx. Ex. 1 at 14.   Furthermore, the remapping decision was not a local Forest decision, but rather a formal decision reviewed and authorized by the Regional Forester's Office.  Ex. 4 at 1-2.

At least three prior cases have addressed similar lynx habitat mapping issues, and all have found that NEPA analysis is required. *Greater Red Lodge II*,

2023 WL 5427921, at *7; *Native Ecosystems Council v. Davey*, 866 F. Supp. 2d 1209, 1212 (D. Id. 2012): *Oregon Nat. Res. Council Fund v. Forsgren*, 252 F.Supp.2d 1088, 1090 (D. Or. 2003).

Most recently, this Court found: "Defendants violated NEPA by failing to take a hard look at the environmental effects of its revisions to the [Custer-Gallatin National Forest] lynx habitat map." *Greater Red Lodge II*, 2023 WL 5427921, at *7.  In *Greater Red Lodge II*, the remapping decision removed 19,000 acres of lynx habitat.  *Id* at *5.  Moreover, in *Greater Red Lodge II*, no LAUS were removed, which was a point that the Forest Service argued should distinguish that case from a prior case.  *Id.*

In contrast, here 1,085,616 acres of lynx habitat were removed, which is over 57 times the amount removed in *Greater Red Lodge II*.  2023 WL 5427921, at *5.  Additionally, in contrast to *Greater Red Lodge II*, in which there were zero LAUs removed, in this case 431 LAUs were removed.  *Id.*  Further, the removal of LAUs in this case compelled official review and authorization by the Regional Office, which is an action this Court noted was missing, though not determinative, in *Greater Red Lodge II*.  *See* 2023 WL 5427921, at *7.  For these reasons, the facts in this case are more egregious than *Greater Red Lodge II* by an order of magnitude, thus the same holding is necessary in this case.

Similarly, in *Davey*, the District of Idaho found that a revised map of lynx

8

habitat on the Caribou-Targhee National Forest required NEPA analysis:

> the adoption of the 2005 [lynx habitat] map falls nicely within the above definition [of major federal action].  The 2005 map was a document officially approved by the Forest Service. . . . There also seems to be little room for debate over whether the 2005 map ultimately governs "uses of Federal resources, upon which future agency actions will be based." 40 C.F.R. § 1508.18(b)(2). Without the adoption of the 2005 map—and the attendant elimination of nearly 400,000 acres of land within LAUs—the Project area would have been subject to the restrictions contained in the Lynx Management Direction, which prohibits precommercial thinning within LAU boundaries. With the adoption of the 2005 map, the 390,900 acres of previously restricted land was opened for uses that were not available without the adoption of the map.
> . . .
> The Court agrees with Plaintiffs and finds that the 2005 map should have been analyzed under NEPA in this case.[2]

866 F.Supp.2d at 1225, 1227.

The same reasoning applies here: like in *Davey*, here the Regional Forester formally authorized the decision to remap lynx habitat and remove LAUs, and here the adoption of the map changes land use restrictions on hundreds of thousands of acres.  *Id.*  Further, in this case, the facts are more egregious: the Forest Service removed protections on almost 1.1 million acres of lynx habitat in this case, whereas 390,900 acres were removed in *Davey*.  *Id.*  Additionally, while

---

[2]Although the District of Idaho made this finding, in a footnote, it clarified: "The Court does not decide the question of whether the 2005 map should have been subjected to NEPA review at the time it was adopted. . . . a NEPA analysis of the 2005 map was required before it could be used as a basis for approving the Project."  866 F.Supp.2d at 1227, n.10.

the decision in *Davey* removed 8 LAUs, the decision in this case removed 431

LAUs. *Id* at 1227. For these reasons, the facts in this case are more egregious

than *Davey*, thus the same holding is necessary in this case.

Finally, the District of Oregon found that new lynx habitat mapping

direction that removed thousands of acres of lynx habitat in the Wallowa-Whitman

National Forest in Oregon required NEPA analysis. The Court held:

> Defendants have substantially minimized the effects of the new
> mapping direction. The new mapping direction was far more than the
> result of day-to-day inventory-taking. It significantly changed the
> nature and the extent of lynx habitat, and the consequences to the
> lynx may be far-reaching. It has been used by the FS to reduce the
> recognized primary lynx habitat within the Forest by thousands of
> acres . . . . The Court finds Defendants, at the least, were required
> under NEPA to prepare an Environmental Assessment with public
> involvement to determine whether the new mapping direction might
> significantly affect the lynx in the Forest and whether Defendants
> should prepare an EIS.

*Forsgren*, 252 F. Supp. 2d at 1105. The same result is required here.

For all of the reasons discussed above, the Forest Service's 2020 remapping

decision is a major federal action that must undergo NEPA analysis. In summary,

the decision removed 1.1 million acres of lynx habitat and 431 LAUs; it changed

future land use prescriptions and restrictions for site-specific projects across the

Forest; and it was formally reviewed and authorized by the Regional Forester's

Office.

In the very least, Plaintiffs have raised serious questions on the merits of

this claim.

> **b.** **The Forest Service violated NEPA by unlawfully tiering the Pintler Face Project EA and DN/FONSI to the 2020 remapping of lynx habitat and removal of LAUs.**

Lynx are "suspected" in the Project area. Ex. 6 at 194. The Project is located in LAUs BH-04, BH-05, BH-06, BH-07, and BH-08, as remapped in 2020. Ex. 6 at 195–196. In the prior lynx habitat map (from 2001), these LAUS were numbered differently; there were more individual LAUs in the same area; and all or almost all of the prior LAUs reached down to the highway, and therefore contained significantly more acreage:



Ex. 1 at 30, 32.

The Forest Service concedes that there are now "portions of the project area, which fall outside of mapped LAUs and do not provide habitat for lynx" and those areas "were not further considered in lynx effects analysis, except for qualitative assessment of connectivity between LAUs." Ex. 7 at 6.

NEPA regulations allow agencies to "tier" analyses from a site-specific EA or EIS back to a programmatic EA or EIS in order to avoid unnecessarily repeating analysis. 40 C.F.R. § 1501.11 (b) (effective September 14, 2020 to June 30, 2024). However, this permission is premised on the programmatic document having a NEPA analysis. *Id.* Accordingly, the Ninth Circuit holds that "tiering to a document that has not been prepared pursuant to NEPA is not permitted, for it circumvents the purpose of NEPA." *Kern v. BLM*. 284 F.3d 1062, 1073 (9th Cir.2002).

In all three cases discussed above, the courts analyzed both the "major federal action" issue discussed above, as well as the issue of whether individual logging projects were unlawfully tiered to the remapping of lynx habitat. These three cases unanimously held that it is unlawful for the Forest Service to tier a logging project to a lynx habitat remap if that remap did not undergo NEPA analysis. *Greater Red Lodge II*, 2023 WL 5427921, at *7; *Davey*, 866 F.Supp.2d at 1227; *Forsgren*, 252 F.Supp.2d at 1107.

This Court's holding on the tiering issue in *Greater Red Lodge II* is

12

instructive:

> Under *Kern*, the Forest Service could not rely on Canfield (2016)'s lynx habitat map without first reviewing Canfield (2016) under NEPA—either separately or as part of the Project EIS.
> . . .
> In this case, like in *Davey*, the Forest Service adopted and relied on a revised lynx habitat map that removed areas within the project boundary from the NRLMD's protections. And, similar to *AWR v. USFS*, the science and data utilized in Canfield (2016) was new and different from that in the NRLMD. However, unlike *AWR v. USFS*, here, the Forest Service did not include the necessary analysis within the Project EIS itself. Because that analysis never occurred, the Court concludes that Canfield (2016) was improperly tiered.
> . . .
> Because the Forest Service improperly tiered to Canfield (2016), the agency violated NEPA's procedural requirements. Plaintiffs' motion for summary judgment is granted on this claim.

2023 WL 5427921, at *7 - 8.  For the same reasons, the same result is required here.

The consistency of the holdings on this issue – from this Court, the District of Idaho, and the District of Oregon – establishes that Plaintiffs have at least raised serious questions on the merits of this claim.

**2.      As this Court recently held in *Ripley*, *Knotty Pine*, and *Marten*, a biological opinion for grizzly bears is arbitrary and capricious if it does not adequately address illegal motorized use, and State and private activities in the action area.  Thus, Claim 3 of Plaintiffs' Complaint raises serious questions because these required analyses are missing from the Biological Opinion for the Project.**

Grizzly bears are "known" "resident[s]" of the Project area.  Ex. 7 at 6.  The

Forest Service assumes that both "individual grizzly bear home ranges and denning sites overlap the project area." Ex. 7 at 33.   The Project includes 11.1 miles of new temporary road construction.  Ex. 5 at 11. The Project analysis also discloses that there are currently 145.0 miles of unauthorized routes in the 73,624-acre Project area.  Ex. 5 at 13.

The Forest Service states: "The [Beaverhead-Deerlodge National Forest] manages for specific open motorized road and trail densities (OMRTD) to provide for wildlife security, including grizzly bears." Ex. 8 at 34.  However, the Forest Service also discloses that the "Big Hole Landscape (where the project lies) is **ABOVE** the desired OMRTD detailed in the Forest Plan, at 1.4 mi road/sq. mile (desired is 1.2 mi /sq. mi)." Ex. 8 at 34 (emphasis in original).  Moreover, this OMRTD calculation does not include known unauthorized motorized routes.

Additionally, the Forest Service chose an "action area" for grizzly bears for the Project that does not align with the Big Hole Landscape: as shown below, the action area (shown on the right with a dashed purple line) is both significantly smaller than the Big Hole Landscape, and it extends outside the Project and Forest boundary to encompass a significant amount of private and other lands.

//

//

14

**Big Hole Landscape**
(*Shaded Black*)

**Pintler Face Project Area**
(*Shaded Black*)
**Grizzly Bear Action Area**
(*Purple-Dashed Line*)





Ex. 8 at 81 – 82 (gray areas indicate National Forest lands).

According to the map on the right above, the "action area" for grizzly bears

for the Project (purple-dashed line) apparently includes private lands, federal lands

other than National Forest lands, and State lands. Ex. 8 at 81 – 82.  Neither the

Forest Service nor FWS disclose the road density, i.e. the OMTRD, for the "action

area" they chose for grizzly bears for the Project, nor do they disclose the State

and private activities occurring on State and private lands in this "action area."

Under the ESA, in a Biological Opinion, FWS must "[e]valuate the effects

of the action and cumulative effects on the listed species . . . ."  50 C.F.R. §

402.14(g)(3). Cumulative effects are defined as "those effects of future *State or private activities*, not involving Federal activities, that are reasonably certain to occur *within the action area* of the Federal action subject to consultation." 50 C.F.R. § 402.02 (emphases added).

Additionally, FWS must "[e]valuate the . . . environmental baseline of the listed species . . . ." 50 C.F.R. § 402.14(g)(2). Environmental baseline includes the "past and present impacts of all Federal, *State, or private actions* and other human activities *in the action area*, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02 (emphases added).

FWS prepared a Biological Opinion for the Project, but it is less than five pages, and it does not analyze the environmental baseline of the action area or cumulative effects in the action area. Ex. 9 at 2-6. There is no disclosure of State and private logging and roading activities in the action area, nor is there any analysis of the impacts on grizzlies from unauthorized motorized use in the action area. Ex. 9 at 2-6.

In a recent preliminary injunction order, this Court addressed a similar situation and held that a biological opinion on the impacts of a logging project on

grizzly bears must address cumulative effects, including activities on State and private lands. *All. for Wild Rockies v. Gassmann*, 604 F.Supp.3d 1022, 1030-1032 (D. Mont. 2022)(granting preliminary injunction)(hereinafter "*Ripley*"). As this Court acknowledged in *Ripley*, it is FWS's regulatory obligation to affirmatively seek out this information. *Id*; *Appalachian Voices v. United States Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022) (emphasizing that FWS must affirmatively seek out and consider existing data under 50 C.F.R. § 402.14(g)(1)).

In this case, the Forest Service's Biological Assessment sets the "action area" for grizzly bears as "approximately 220,138 acres" that "can be found in" a map in an appendix. Ex. 8 at 31. A portion of that map is set forth above, with the agency-designated "action area" indicated with a purple dashed line. Ex. 8 at 81 – 82. The action area is three times the size of the Project area and appears to include State lands, private lands, and potentially other non-National Forest federal lands (such as BLM lands.). *Id.*

The Forest Service's Biological Assessment includes four paragraphs in the "cumulative effects" section for grizzly bears, but those paragraphs contain no meaningful disclosure or analysis of the activities on State lands, private lands, and other federal lands in the action area. Ex. 8 at 46-47. In turn, FWS's Biological Opinion does not contain any cumulative effects analysis at all for grizzly bears. *See* Ex. 9. Thus, for the same or similar reasons as in *Ripley*, here

too Plaintiffs have raised serious questions on the merits.  604 F.Supp.3d at 1030-1032.

Subsequently, in a different preliminary injunction order, this Court addressed another similar challenge to a logging project grizzly bear Biological Opinion.  *Ctr. for Biological Diversity v. USFS*, 670 F. Supp. 3d 1121, 1137 (D. Mont. 2023)(hereinafter "*Knotty Pine*").  Although FWS did include at least some information and analysis regarding unauthorized motorized use in that project's biological opinion, in both the environmental baseline and cumulative effects sections, this Court ultimately held that the analysis was arbitrary and capricious because known unauthorized motorized routes were excluded from motorized route density calculations.  *Id* at 1131 – 1138.

The facts in this case are even more compelling than those in *Knotty Pine* because here there is no analysis of unauthorized motorized use at all:  neither the Forest Service Biological Assessment nor the FWS Biological Opinion analyze how unauthorized motorized use impacts grizzly bears in the action area, or even the smaller Project area.  This failure is significant because there is a significant number of known unauthorized motorized routes in the Project area alone: 145.0 miles. Ex. 5 at 13. This number is so high that it surpasses the number of legally open roads in the Project area: 100.6 miles.  Ex. 5 at 13. Thus, while the open road density is 0.87 when only legally open roads are included (100.6/115 square

18

miles), the open road density is 2.13 when both legally open roads and unauthorized roads are included ((100.6 + 145.0)/115 square miles).  These two calculations of open road density represent dramatically different effects on grizzly bears according to well-established grizzly bear research.  *See e.g. All. for the Wild Rockies v. Marten*, 585 F. Supp. 3d 1252, 1281 n.13 (D. Mont. 2021)(noting that "high density [] open motorized access" for grizzly bears is "> 1 mile/square mile").

Nonetheless, in the Biological Opinion, FWS ignores the known unauthorized motorized use in this Project area, and instead relies on an open road density calculation (for the entire Big Hole Landscape area, as opposed to the action area or Project area) that includes only legally open roads: 1.2 mi/sq mi.  Ex 9 at 3–4.  Further, FWS made no attempt to seek out information regarding how much more unauthorized motorized use is occurring in the action area as a whole. As noted above, the regulations require FWS to analyze cumulative effects at the "action area" scale.   50 C.F.R. § 402.02.  FWS has not yet undertaken this analysis.  Thus, for the same or similar reasons as in *Knotty Pine*, here too Plaintiffs have raised serious questions on the merits.  670 F. Supp. 3d at 1131 – 1138.

Finally, this Court addressed another similar challenge to a grizzly bear biological opinion for a forest plan in *All. for the Wild Rockies v. Marten*.  685 F.

Supp. 3d 971 (D. Mont. 2023), *appeal dismissed*, No. 23-2553, 2024 WL 1459881

(9th Cir. Mar. 5, 2024).  In that case, this Court held that FWS's analysis of

unauthorized road use was inadequate, in part because it simply repeated the same

inadequate language addressed in *Knotty Pine*:

> this paragraph is identical—word for word—to the analysis in the
> cumulative effects section of the BiOp for the Knotty Pine Project on
> the Kootenai National Forest. [] This Court found that the plaintiffs in
> that case were likely to succeed on the merits of their claim that such
> analysis violated the ESA and APA.

*Id.* The Court noted both that FWS was already aware of evidence of unauthorized

use, and that FWS "did not seek to collect any additional updated law enforcement

data concerning unauthorized motorized access or incorporate any analysis of such

data into the 2021 BiOp."  *Id.*

The facts in this case are even more compelling than those in *Marten*

because here, as discussed above, the Pintler Face Project Biological Opinion

contains no analysis of unauthorized motorized use at all; indeed, the Project

Biological Opinion here does not even contain "environmental baseline" and

"cumulative effects" sections.

In conclusion, FWS has violated its regulatory mandates to address

cumulative effects and environmental baseline – at the action area scale – in the

Project Biological Opinion.  Similar to *Ripley*, *Knotty Pine*, and *Marten*, here too

FWS has failed to address State and private logging activities and roads in the

action area, and has failed to address known unauthorized motorized use, and has

failed to affirmatively seek additional information on unauthorized motorized use

outside the Project area but within the action area.  Plaintiffs have surpassed their

burden here to raise serious questions on the merits.

**B.    There is a likelihood of irreparable harm in the absence of preliminary relief.**

The Supreme Court holds that "[e]nvironmental injury, by its nature, can

seldom be adequately remedied by money damages and is often permanent or at

least of long duration, i.e., irreparable. If such injury is sufficiently likely,

therefore, the balance of harms will usually favor the issuance of an injunction to

protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, AK, 480 U.S. 531,

545 (1987).

In this case, the challenged activities will imminently and irreparably harm

Plaintiffs' members' interests:

> On April 26, 2024, the Forest Service filed a brief that states: "The
> agency began Project implementation in October 2021. 'Pintler Face,
> Project Milestones,' https://www.fs.usda.gov/ project/bdnf/?project=
> 49404  (last accessed April 25, 2024." (Doc. 13 at 8-9).  There is no
> sworn declaration to support this representation, and the cited website
> only states that activities were "estimated" to start October 1, 2021.
> In contrast, on May 15, 2024, Intervenors filed sworn declarations
> indicating that one timber sale was awarded in mid-2022, and the
> remaining three timber sales were either awarded last year (2023) or
> this year.  (Docs. 17-3 ¶10; 17-2 ¶1.) One timber sale is complete;
> two are ongoing; one has not yet started.  *Id.*  So it appears that
> Project activities have thus far primarily occurred last year, with the
> exception that one of the four timber sales has not yet started.

21

Although there is a temporary reprieve for grizzly bears from March 1 to July 15 each year, our harms are actual and imminent because Project activities could proceed or recommence as soon as July 16, 2024. If operations are allowed to proceed as planned, the area will be irreversibly degraded because once logging occurs, the Forest Service cannot put the trees back on the stumps, and our interests in the area will be irreparably harmed to the point that the area is no longer adequate for our esthetic, recreational, scientific, spiritual, vocational, and educational interests. In other words, this area will never look or be the same during the lifetimes of our members. Additionally, regarding our interests in grizzly bears, the displacement of grizzly bears during the 10-year Project duration may cause grizzlies to avoid the area for generations afterwards since this type of avoidance behavior is a learned behavior that is passed on to cubs. Therefore, this specific project will likely cause irreparable damage to our members' interests because it will harm our members' ability to view, experience, and utilize the area in its undisturbed state and thus prevent the use and enjoyment by our members of hundreds of acres of the Forest. This is the same type of harm to our members posed by the Rat Creek Project on the Beaverhead-Deerlodge National Forest and the Ninth Circuit agreed that such harm is irreparable for the purpose of requesting a preliminary injunction in *Alliance for the Wild Rockies v. Cottrell*.

Declaration of Michael Garrity ¶ 11 (May 15, 2024).

In *Cottrell*, the Ninth Circuit held that this type of harm to Plaintiffs'

members' interests satisfies the irreparable harm prong of the preliminary

injunction test:

AWR's members use the Beaverhead–Deerlodge National Forest, including the areas subject to logging under the Project, for work and recreational purposes, such as hunting, fishing, hiking, horseback riding, and cross-country skiing. AWR asserts that its members' interests will be irreparably harmed by the Rat Creek Project. In particular, AWR asserts that the Project will harm its members' ability to "view, experience, and utilize" the areas in their undisturbed state. . . .

22

> The Project will prevent the use and enjoyment by AWR members of
> 1,652 acres of the forest. This is hardly a de minimus injury.
> . . .
> But actual and irreparable injury, such as AWR articulates here,
> satisfies the "likelihood of irreparable injury" requirement articulated
> in *Winter.*

*Cottrell*, 632 F.3d at 1135.  The Ninth Circuit reached a similar holding in

*Connaughton*: "The logging of mature trees, if indeed incorrect in law, cannot be

remedied easily if at all."  752 F.3d at 764-65.

The same is true in this case: "once logging occurs, the Forest Service

cannot put the trees back on the stumps . . . . In other words, this area will never

look or be the same during the lifetime of our members.  Therefore, this specific

project will likely cause irreparable damage to our members' interests because it

will harm our members' ability to view, experience, and utilize the area in its

undisturbed state and thus prevent the use and enjoyment by our members of

hundreds of acres of the Forest."  Garrity Declaration ¶11.

For all of these reasons, there is a likelihood of irreparable harm in the

absence of preliminary relief.

**C.    The public interest and balance of the equities tip sharply in favor of
Plaintiffs**.

"The preservation of our environment, as required by NEPA and the NFMA,

is clearly in the public interest."  *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033

(9th Cir. 2007)(citation omitted); *see also Earth Island Inst. v. USFS*, 351 F.3d

1291, 1309 (9th Cir. 2003)(citation omitted). In addition to the preservation of the environment, "ensuring that government agencies comply with the law is a public interest of the highest order." *Native Ecosystems Council v. USFS*, 866 F. Supp. 2d 1209, 1234 (D. Id. 2012)(citation omitted). "The public has an undeniable interest in the Forest Service's compliance with NEPA's environmental review requirements and in the informed decisionmaking that NEPA is designed to promote." *Colorado Wild Inc. v. USFS*, 523 F.Supp.2d 1213, 1223 (D. Colo. 2007).

As in *League of Wilderness Defs v. Connaughton*, here too "the harms [plaintiff] face[s] are permanent, while the [agency] face[s] temporary delay . . . the marginal harm to the [agency] of the preliminary injunction is the value of moving those jobs and tax dollars to a future year, rather than the present. The [] plaintiff[s'] irreparable environmental injuries outweigh the temporary delay the [agency] face[s] in receiving a part of the economic benefits of the project." 752 F.3d 755, 765-66 (9th Cir. 2014).

Thus, in this case, as in *Cottrell*, "the public interest in preserving nature and avoiding irreparable environmental injury outweighs economic concerns . . . ." 632 F.3d at 1137-38 (citation omitted). As this Court held in a similar case: "The balance of equities tips in favor of Alliance because it faces permanent damage if logging activity were to proceed and the Forest Service faces only

24

delay. . . . While mitigating the imminent risk of forest fires and insect infestation is a valid public interest . . . there is no indication of an imminent threat here. Without evidence of an imminent threat it would be difficult to say that the inability to mitigate such risks for a temporary period outweighs the public's interest in maintaining the environment and requiring that agencies follow proper procedures." *All. for the Wild Rockies v. Marten*, 200 F. Supp. 3d 1110, 1112 (D. Mont. 2016).

Likewise, in a different case, this Court similarly held: "though there is the possibility of serious fire activity within the boundaries of the Project, there is no indication that this area is at risk of imminent fire activity." *All. for Wild Rockies v. Marten*, 253 F.Supp.3d 1108, 1112 (D. Mont. 2017). Similarly, in *All. for the Wild Rockies v. Gassmann*, this Court held: "although preventing catastrophic wildfire undoubtedly is a goal in the public interest, Plaintiff has set forth significant evidence in the administrative record calling into question the imminence of that concern in the Ripley Project area, specifically." 604 F. Supp. 3d 1022, 1037 (D. Mont. 2022); *see also Ctr. for Biological Diversity v. USFS.*, 2023 WL 3052299, at *15 (D. Mont. 2023)(rejecting similar argument and granting preliminary injunction).

Similar to *Connaughton*, the *Marten* cases, and *Gassman*, there is no evidence of imminent wildfire risk or imminent insect outbreaks here. First, the

Forest Service did not design this Project to reduce wildfire risk, nor did the Forest Service indicate any official need to do so.  Instead, during the public comment period on the Project, members of the public asked the Forest Service to "[d]isclose the efficacy of the proposed activities at reducing wildfire risk and severity in the Project area in the future, including a two-year, five-year, ten-year, and 20-year projection." Ex. 10 at 18.   In response, the Forest Service conceded: "The Pintler Face project does not have a purpose and need to reduce wildfire risk; therefore it is not analyzed in the EA."  Ex. 10 at 18, *see also* 29 (agency admission that "[r]educing wildfire risk and severity in the project area is not a part of the purpose and need[]"), at 159 ("Cohen's vast body of work is most applicable in the context of home ignitability and applies directly to project's whose focus is reducing losses in the built environment. However, that is not the focus of this project, please see the purpose and need of the project."), 160 ("Protection of the wildland urban interface is not a part of the Purpose and Need of this project"), 205 ("the Pintler Face project does not claim to reduce fuels nor reduce the potential for large wildfires.")

Second, regarding the potential for insect outbreaks, a Forest Service report in the record, written by the Forest Entomologist and Plant Pathologist, MFO-TR-16-42, indicates:  "Mountain Pine Beetle in LPP [lodgepole pine] is the only insect in the stands we visited that is of significant management concern."  Ex. 11 at 1.

The report further finds: "there is a significant overestimation of the total area currently at risk." Ex. 11 at 7. The report explains: "based on field visits, many stands currently indicated as highly susceptible may actually be LPP between 120 and 200 years old. . . .Trees over 120 years of age tend to slow in growth resulting in phloem thickness too thin to support strong reproductive success [of beetles.]" Ex. 11 at 7. Accordingly, the Forest Service conceded: "The purpose and need for this project does not include actions to reduce beetle activity or wildfire risk." Ex. 10 at 194.

Therefore, based on the Forest Service's own admissions in the record, neither imminent wildfire risk, nor imminent insect outbreaks, are significant concerns in this particular area that would outweigh the strong public interest in ensuring that government agencies follow the law. For all of these reasons, the public interest and balance of equities tip sharply in Plaintiffs' favor.

## IV.  CONCLUSION

For all of the reasons discussed above, Plaintiffs respectfully request that this Court preliminarily enjoin, or issue a temporary restraining order against, the Pintler Face Project to maintain the status quo until this Court issues a final decision on the merits of this case.

Respectfully submitted this 17th Day of May, 2024.

*/s/ Rebecca K. Smith*
Rebecca K. Smith
Public Interest Defense Center, P.C.
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief is 6,452 words, excluding the caption, tables, signature blocks, and certificate of compliance.

*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Attorneys for Plaintiffs