IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| YELLOWSTONE TO UINTAS CONNECTION; NATIVE ECOSYSTEMS COUNCIL; ALLIANCE FOR THE WILD ROCKIES<br><br>    Plaintiffs,<br><br>vs.<br><br>LEANNE MARTEN, in her official capacity as Regional Forester; LISA TIMCHAK, in her official capacity as National Forest Supervisor; UNITED STATES FOREST SERVICE; and UNITED STATES FISH & WILDLIFE SERVICE,<br><br>    Federal Defendants,<br><br> and<br><br>SUN MOUNTAIN LUMBER, INC., IRON PINE COMPAY, LLC, POWELL COUNTY, and ANACONDA-DEER LODGE COUNTY<br><br>    Intervenor-Defendants. | CV 24–25–M–DLC<br><br>ORDER |

1

Before the Court is Federal Defendants' Motion to Dismiss (Doc. 12) and Plaintiffs' Motion for Preliminary Injunction and/or Motion for Temporary Restraining Order (Doc. 26).  For the reasons stated herein, the Motion to Dismiss is DENIED and the Motion for Preliminary Injunction and/or Motion for Temporary Restraining Order is GRANTED IN PART and DENIED IN PART.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     The Project

The Pintler Face Project area consists of 73,624 acres on the South face of the Anaconda-Pintler Mountains on the Wisdom Ranger District of the Beaverhead-Deerlodge National Forest ("BDNF").  (Doc. 27-6 at 13.)  The Project area is within Deer Lodge and Beaverhead Counties as well as the Fishtrap-Mount Haggin and Pintler Face Management Areas of the Big Hole Landscape.  (*Id.*)  The Project is located in Lynx Analysis Units (LAUs) BH-04, BH-05, BH-06, BH-07, and BH-08, as remapped in 2020.  (Doc. 27-7 at 7.)

Scoping for the Project began in July 2016.  (Doc. 27-6 at 16.)  On November 9, 2017, the Project EA was published for a 30-day public comment period.  (Doc. 27-5 at 19.)  The legal notice initiating the objection period was published in the Montana Standard on April 25, 2021, and the 45-day objection filing period ended on June 9, 2021.  (*Id.*)

The Project includes 3,934 acres of timber harvest including commercial thinning, clearcutting, and aspen harvest. (Doc. 27-6 at 27–28.) The Project also includes 7,765 acres of non-commercial vegetation treatments including thinning, understory burn and cutting and burning of grasses, shrubs, and in riparian areas. (*Id.* at 28–31.) All commercial harvest activities involve timber salvage to remove trees that are mostly dead or dying due to pine beetle infestations. (Doc. 37-1 ¶ 3.)

The Project EA authorizes four timber sales: Pintler Face 1 Salvage, Pintler Face 2 Salvage, Pintler Face 3 Salvage, and Pintler Face 4 Salvage. (Doc. 37-2 ¶ 2.) The Forest Service publicly advertised the Project's salvage contracts in November 2021, May 2022, February 2023, and October 2023. (*Id.* ¶ 3.) Pintler Face 1 Salvage Timber Sale was awarded to RY Timber, Inc. on July 14, 2022. (*Id.*) Pintler Face 2 Salvage Timber Sale was awarded to Sun Mountain Lumber, Inc. on March 16, 2023. (*Id.*) Pintler Face 3 and 4 Timber Sales were awarded to Iron Pine Company, LLC, on January 5, 2022, and December 14, 2023, respectively. (*Id.*) On January 1, 2024, following Sun Mountain's purchase of RY Timber, the Forest Service approved a third-party agreement allowing Sun Mountain to assume the responsibility of completing the Pintler Face 1 contract. (*Id.* ¶ 4.)

Pintler Face 1 operations began on August 8, 2022, and Pintler Face 1 is 26.2% complete. (Doc. 37 at 14.) Pintler Face 2 operations started August 9, 2023

3

and Pintler Face 2 is 29.3% complete.  (Doc. 37 at 14.)  Pintler Face 3 operations started on July 27, 2022.  (*Id.*)  The sale was completed on September 25, 2023, and officially closed on January 17, 2024; in other words, Pintler Face 3 is 100% complete.  (Doc. 37-2 ¶ 7.)  Pintler Face 4 operations are set to begin in November 2024.  (Doc. 37 at 14.)  All Project activities are currently suspended and set to restart July 16, 2024, following the close of spring bear season.  (Doc. 27-6 at 38.)

On February 16, 2024, approximately 19 months after operations on the Pintler Face Project began, Plaintiffs filed the instant action.  (Doc. 1.)  First, Plaintiffs allege that the Forest Service violated NEPA by failing to prepare a stand-alone NEPA analysis, either an EA or an EIS, for the 2020 remapping of lynx habitat and LAUs on the BDNF ("2020 Remapping Decision").  (Doc. 1 at 17.)  Second, Plaintiffs allege that the Forest Service violated NEPA by unlawfully tiering the Project EA and DN/FONSI to the 2020 remapping of lynx habitat and removal of LAUs.  (*Id.* at 20.)  Third, Plaintiffs allege that the Forest Service's failure to prepare an EIS for the Project violates NEPA.  (*Id.* at 21.)  Finally, in Plaintiffs' Fourth Claim for Relief, they allege that the U.S. Fish & Wildlife Service's ("FWS") Project Biological Opinion fails to use the best available science and fails to adequately address the environmental baseline, and/or direct, indirect, and cumulative effects on grizzly bears.  (*Id.* at 23.)

On April 4, 2024, in response to Plaintiffs' lawsuit and recent opinions from this Court, the Forest Service reinitiated consultation for the Project to address newly listed species and update the grizzly bear "habitat analysis" and "information about illegal motorized use." (Doc. 37-3 at 2.) On April 26, Federal Defendants filed a Motion to Dismiss for Failure to State a Claim. (Doc. 12.) On May 16, United States Magistrate Judge Kathleen L. DeSoto granted Iron Pine and Sun Mountain's Motion to Intervene. (Doc. 20.) On May 26, Plaintiffs filed a Motion for Temporary Restraining Order and Motion for Preliminary Injunction. (Doc. 26.) The Court withdrew its referral to Judge DeSoto in light of the Motion. (Doc. 28.) Meanwhile, on May 30, the Forest Service transmitted an updated BA to FWS and subsequently suspended Project activities until FWS issues the superseding Project BiOp. (Doc. 37 at 15.) On June 4, the Court granted Powell and Anaconda-Deer Lodge Counties' Motion to Intervene. (Doc. 35.) Briefing on the Motion for Preliminary Injunction was completed on June 17, 2024, and the Court heard oral argument on June 25. Activities in the Project area are set to re-commence on July 16, 2024. (Doc. 27-6 at 38.)

## II.     The Lynx[1]

In 2000, FWS listed the Canada lynx as a threatened species under the Endangered Species Act ("ESA"). Following the listing, an interagency lynx biology team consisting of biologists from the Forest Service, FWS, Bureau of Land Management, and National Park Service developed the Lynx Conservation Assessment and Strategy ("LCAS"). The LCAS recommended measures intended to conserve the lynx, and to reduce or eliminate adverse effects from the spectrum of management activities on federal lands. These conservation measures focused on areas where habitat could support resident populations and contribute to the long-term conservation of lynx.

The LCAS described the typical characteristics of lynx habitat but did not actually develop any maps of lynx habitat. Instead, the LCAS instructed that specific national forests, BLM field offices, national parks, and wildlife refuges should develop or refine maps of known lynx occurrence and potential lynx habitat. The LCAS also created LAUs to provide analysis units of the appropriate scale with which to begin the analysis of potential direct and indirect effects of projects or activities on individual lynx, and to monitor habitat changes. LAUs encompass both lynx habitat and non-lynx habitat, but

---

[1] Portions of this section are taken from this Court's opinion in *Alliance for the Wild Rockies v. U.S. Forest Serv.*, No. CV 21-84-M-DLC, 2023 WL 5427921 (D. Mont. Aug. 23, 2023), *appeal dismissed*, No. 23-3059, 2024 WL 1729833 (9th Cir. Feb. 7, 2024) ("Greater Red Lodge II"). Internal quotations and citations are omitted.

6

the conservation measures generally only apply to lynx habitat within an LAU.

In 2001, the Forest Service developed a lynx habitat map for the BDNF. (Doc. 27-1 at 6.)  The map designated 2,711,422 acres as mapped lynx habitat and designated 509 LAUs.  (*Id.* at 2–3.)

In 2007, the Northern Rockies Lynx Management Division ("NRLMD") amended the forest plans of 18 national forests, including the BDNF, to add management direction that conserves and promotes recovery of Canada lynx, by reducing or eliminating adverse effects from land management activities on National Forest System lands, while preserving the overall multiple-use direction of existing plans.  The NRLMD describes lynx habitat as follows:

> Lynx habitat occurs in mesic coniferous forest that experience cold, snowy winters and provide a prey base of snowshoe hare. In the northern Rockies, lynx habitat generally occurs between 3,500 and 8,000 feet of elevation, and primarily consists of lodgepole pine, subalpine fir, and Engelmann spruce. It may consist of cedar-hemlock in extreme northern Idaho, northeastern Washington and northwestern Montana, or of Douglas-fir on moist sites at higher elevations in central Idaho. It may also consist of cool, moist Douglas-fir, grand fir, western larch and aspen when interspersed in subalpine forests. Dry forests do not provide lynx habitat.

The NRLMD also explains that lynx habitat in a national forest is considered "occupied" when there are at least two verified lynx observations or records since 1999 on the national forest, unless they are verified to be transient individuals, or there is evidence of lynx reproduction on the national forest.

While the BDNF was not originally designated as occupied by lynx, in September 2020, the Western Lynx Biology Team concluded that "lynx detections on the BDNF meet the provisions for an 'occupied' Forest as defined in the 2006 Amendment Conservation Agreement." (Doc. 27-3.)

In 2020, the Forest Service remapped lynx habitat and LAUS within the BDNF. (Doc. 27-1 at 19.) The remapping effort resulted in a 60% decrease in lynx habitat—from 2,711,422 acres in 2001 to 1,625,806 acres in 2020. (*Id.*) Additionally, the Forest Service reduced the LAUs within the forest from 509 LAUs to 78 LAUs. (*Id.*) The Forest Service did not prepare a NEPA analysis for the elimination of LAUs or the elimination of approximately 1.1 million acres of lynx habitat.

Additional facts in the record are discussed as they become relevant in the analysis below.

## DISCUSSION

### I. Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

8

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Dismissal is appropriate "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017) (internal quotation marks omitted). "In general, the [Rule 12(b)(6)] inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff"; however, the Court "need not accept as true allegations contradicting documents that are referenced in the complaint or that are properly subject to judicial notice." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) (internal citation omitted).

Federal Defendants first argue that Plaintiff Yellowstone to Uintas Connection should be dismissed from this action because it failed to comment on the Project during the public comment process and because it failed to exhaust administrative remedies. (Doc. 13 at 13.) In response, Plaintiffs argue that Yellowstone to Uintas did not have the opportunity to file comments challenging the 2020 Remapping Decision because both the scoping period and EA comment period occurred years before the 2020 decision. (Doc. 25 at 17.) The Court agrees with Plaintiffs.

Generally, "[i]ssues raised in objections must be based on previously submitted specific written comments regarding the proposed project or activity and

attributed to the objector." 36 C.F.R. § 218.8(c).  However, this requirement does not apply where "the issue is based on new information that arose after the opportunities for comment." *Id.*  Federal Defendants claim that "[t]he Forest Service engaged in robust public outreach and solicitation of feedback for the Project" beginning in July 2016.  (Doc. 13 at 10.)  After receiving initial comments on the scoping notice in July 2016, the Forest Service sent out a second scoping notice and held another comment period.  (*Id.* at 10–11.)  In September 2016, the Forest Service held a site visit to the Project area and a public open house in Wise River.  (*Id.* at 11.)  During the summer of 2017, an interdisciplinary team developing the Project held five open-house style public meetings in Anaconda, Wisdom, Wise River, Dillon, and Butte.  (*Id.*)  On November 9, 2017, the Forest Service issued the Draft EA and published a notice of opportunity to comment.  (*Id.*)  However robust this chronology of public outreach may have been, there is one glaring issue: all the opportunities to comment preceded the 2020 Remapping Decision at the crux of Claims One and Two.  Plaintiffs—specifically, Yellowstone to Uintas—cannot be expected to comment on an issue that the Forest Service has not disclosed to the public.  Accordingly, the Court rejects Federal

Defendants' argument and finds that Yellowstone to Uintas is a proper plaintiff in this action.

Next, Federal Defendants argue that the Court should dismiss Claims One and Two because Plaintiffs failed to exhaust their administrative remedies for those claims. (Doc. 13 at 16.) Beginning with Claim One, Federal Defendants argue that Plaintiffs failed to allege in their objections that the 2020 updates to the maps required a separate NEPA analysis, and therefore, that claim must be dismissed for failure to exhaust administrative remedies. (Doc. 13 at 17.) Similarly, regarding Claim Two, Federal Defendants argue that Plaintiffs' objections do not identify the 2020 Remapping Decision as an issue of concern, and thus, Claim Two should also be dismissed for failure to exhaust administrative remedies. (Doc. 13 at 17.) In response, Plaintiffs argue that Federal Defendants did not offer an administrative objection/appeal process for the decision to remap. (Doc. 25 at 9.) Specifically, Plaintiffs contend that the April 2021 EA did not disclose the details of the 2020 Remapping Decision, and the 2016 Scoping Notice and 2017 Draft EA were issued years before the 2020 Remapping Decision. (Doc. 25 at 10.) At oral argument, Counsel for Plaintiffs represented that Plaintiffs received the remapping document in July 2021, approximately one year after objections for the Project had been filed. Based on the chronology of events and the fact that Plaintiffs were not made aware of the details of the remapping until months after the 2020 Remapping

11

Decision, the Court rejects Federal Defendants argument that Plaintiffs failed to address their concerns with the 2020 Remapping Decision during the administrative process.  Federal Defendants' Motion to Dismiss (Doc. 12) is DENIED.

## II. <u>Preliminary Injunction</u>

Typically, "a plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "Under the sliding scale approach to a preliminary injunction, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing for another."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  The Ninth Circuit has adopted an alternative "serious questions" test under which a court may issue a preliminary injunction "where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor."  *Id.* at 1131–32 (internal quotations omitted).

### A. Serious Questions Going to the Merits

Plaintiffs have raised serious questions going to the merits as to Claims One and Two.

NEPA requires federal agencies to prepare a detailed EIS for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  Major Federal actions include new and continuing activities, including projects and programs entirely or party financed, assisted, conducted, regulated, or approved by Federal agencies; new or revised agency rules, regulations, plans, policies or procedures; and legislative proposals." 40 C.F.R. § 1508.18(a) (2020).  "Major Federal actions" include adoption of "official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future actions will be based," as well as adoption of programs "such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." 40 C.F.R. § 1508.18(b).

An EIS must provide a "full and fair discussion of significant environmental impacts," and inform "decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.  NEPA does not, however, "mandat[e] that agencies achieve particular substantive environmental results." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).  Instead, NEPA simply "ensures that the agency, in reaching its decision, will have available, and will carefully

consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision[-]making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.* at 350.

In *Greater Red Lodge II*, this Court found that the Forest Service violated NEPA by failing to take a hard look at the environmental effects of its revisions to the Custer Gallatin National Forest lynx habitat map and unlawfully tiering a Forest Service project EIS to the revised habitat map. 2023 WL 5427921, at *7. There, the Forest Service remapping decision resulted in the removal of 19,000 acres of lynx habitat. *Id.* at *5. However, notably, no LAUS were removed. Nonetheless, the Court held that the Forest Service could not rely on a new lynx habitat map that removed areas within the project boundary from NRLMD's protections without reviewing the new map under NEPA. *Id.* at *7–8. Here, in comparison, the 2020 Remapping Decision resulted in the removal of more than 1,000,000 acres of lynx habitat and 431 LAUs. Based on this Court's own precedent, Plaintiffs have raised serious questions going to the merits as it relates

to their claims that the Forest Service violated NEPA by (1) failing to prepare a NEPA analysis for the 2020 Remapping Decision and (2) unlawfully tiering the Project EA and DN/FONSI to the new map.

Other courts have likewise held that the remapping of lynx habitat requires a NEPA analysis. For example, in *Native Ecosystems Council v. United States Forest Service*, the District of Idaho found that the Forest Service was required to conduct a NEPA review of a map that removed eight LAUs and 400,000 acres of lynx habitat before using the map as a basis for approving a project. 866 F. Supp. 2d 1209, 1227 (D. Idaho 2012). The Court explained that "the adoption of the 2005 map falls nicely within" the definition of a major Federal action and "with the adoption of the 2005 map, the 390,900 acres of previously restricted land was opened for uses that were not available without the adoption of the map." *Id.* at 1225.

Similarly, in *Oregon Natural Resources Council Fund v. Forsgren*, the District of Oregon found that because a new mapping direction "significantly changed the nature and extent of lynx habitat, and the consequences to the lynx may be far-reaching," the mapping direction constituted a major federal action. 252 F. Supp. 2d 1088, 1091 (D. Or. 2003). Accordingly, the government was "required under NEPA to prepare an Environmental Assessment with public involvement to determine whether the new mapping direction might significantly

15

affect the lynx in the Forest and whether Defendants should prepare an EIS." *Id.* at 1105.

### B. Likelihood of Irreparable Injury

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Plaintiffs allege that the Project will cause imminent and irreparable harm. Michael Garrity, Executive Director of Plaintiff Alliance for the Wild Rockies, declared that:

> the Forest Service's failure to provide adequate protections and analysis for grizzly bears and lynx is irreparably harming the Alliance's members' interests in the survival and recovery of these grizzly bears and lynx including but not limited to their interests in looking for, viewing and studying grizzly bears and lynx including in the Project area, the grizzly bear "action area," the Big Hole Landscape, and the area impacted by the Lynx Habitat Remapping Decision.

(Doc. 27-12 ¶ 4.) While this type of harm satisfies the irreparable harm prong of the preliminary injunction test, the Court would be remiss to overlook the significant delay in filing this action, and the fact that such delays weigh against a finding of imminent irreparable harm. *Helena Hunters and Anglers Association v. Marten*, No. CV 19-106-M-DLC, 2019 WL 5069002, at *2 (D. Mont. Oct. 9, 2019). In *Helena Hunters and Anglers Association*, this Court explained that a

"delay of even a few months . . . is a significant delay in the life of a timber sale operation." *Id.*  Here, Plaintiffs' counsel was first made aware of the results of the 2020 Remapping Decision in July 2021 but did not file the instant action until February 2024.  At the hearing, Plaintiffs' counsel attributed the delay to counsel's lack of availability.  While the Court is sympathetic to the difficulties associated with balancing a large caseload, these difficulties do not negate the impression that if the need for a preliminary injunction had been deemed essential prior to implementation of the project, counsel would have made time.  Delay alone, however, is not enough to deny Plaintiffs' Motion.  *Id.*  Accordingly, the Court moves on to the balance of equities and the public interest.

### C. Balance of Equities and the Public Interest

The balance of equities and public interest—as they relate to the commercial activities of the Project—weigh in favor of Federal Defendants and Intervenor-Defendants.  According to Seth Beck, the owner of Iron Pine, "Deer Lodge and Powell County . . . are timber dependent communities" and "[t]here are not significant numbers of alternative economic opportunities for many people in the area." (Doc. 17-3 ¶ 7.)  Pyramid Mountain Lumber in Seeley Lake and Roseburg Forest Products in Missoula announced closures this year, causing Iron Pine a significant loss.  (*Id.* ¶ 6.)  Beck declared that, should the Court enjoin the

17

commercial Project activities, he would be forced to immediately lay off half of his work force and may have to permanently close Iron Pine all together. (*Id.* ¶ 11.)

Sun Mountain Lumber employs more than 150 people in its Deer Lodge location and is the largest private employer in the area. (Doc. 17-2 ¶¶ 5–6.) Because Sun Mountain does not own any private timberlands, it is heavily dependent on log inventory originating from National Forests. (*Id.* ¶ 11.) Sun Mountain made significant investments in the two Salvage Timber Sales, including more than $170,000 in bid guarantees and approximately $280,000 in road improvements. (*Id.* ¶ 20.) The timber from Pintler Face 1 and Pintler Face 2 will support the operations of the Deer Lodge mill for three to four months. (*Id.* ¶ 21.) Because dead and dying timber loses its commercial value rapidly, even a short-term injunction would jeopardize the local economy. Therefore, the balance of equities weighs against enjoining the commercial activities of the Project.

However, as it relates to the non-commercial activities of the Project, the balance of equities and public interest weigh in favor of issuing an injunction. While Deer Lodge and Powell Counties' economies are largely dependent on the timber sales from the Project, the same cannot be said for the non-commercial treatments. Meanwhile "[t]he preservation of our environment, as required by NEPA and the NFMA, is clearly in the public interest," *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007), and "ensuring that government agencies

comply with the law is a public interest of the highest order," *Native Ecosystems Council v. United States Forest Serv.*, 866 F. Supp. 2d 1209, 1234 (D. Idaho 2012). Accordingly, the Court finds that this factor tips sharply in Plaintiffs favor as to the following non-commercial treatment described by counsel for Federal Defendants at the hearing: 564 acres of noncommercial thinning, 293 acres of understory burn, 559 acres of noncommercial cutting and burning of grasses, 3,099 acres of noncommercial cut and burn of shrubs, and 1,718 acres of noncommercial cut and burn in riparian areas.

### D. Conclusion

Plaintiffs have raised serious questions going to the merits and established a likelihood of irreparable injury as to Claims One and Two.  The balance of the equities and public interest favor enjoining the non-commercial activities but allowing the commercial timber sales to proceed.

Accordingly, IT IS ORDERED that Federal Defendants' Motion to Dismiss (Doc. 12) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Motion (Doc. 26) is GRANTED IN PART and DENIED IN PART.  Pintler Face 1, Pintler Face 2, Pintler Face 3, and Pintler Face 4 may proceed.  Defendants are enjoined from implementing the remaining non-commercial treatments of the Pintler Face Project until this case has reached a decision on the merits.

DATED this 12th day of July, 2024.

_____
Dana L. Christensen, District Judge
United States District Court